**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiffs,*
*FLSA Collective Plaintiffs,*
*and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ABEL ORTEGA and MARIA GOMEZ,
*on behalf of themselves, FLSA Collective*
*Plaintiffs, and the Class,*

                    Plaintiffs,

        v.

SEA THAI HOSPITALITY INC.
        d/b/a SEA THAI BROOKLYN,
SPICE CITY, INC.
        d/b/a SEA THAI BROOKLYN,
SPICEWB INC.
        d/b/a SPICE,
357 HOSPITALITY INC.
        d/b/a SPICE,
975 AMSTERDAM INC,
        d/b/a SPICE,
KL 747 INC
        d/b/a SPICE,
SPICE 39 INC
        d/b/a SPICE,
SPICE ON PARK SLOPE, INC
        d/b/a SPICE,
THAMMA INC,
        d/b/a THE SABIENG THAI,
SPICE CORNER 236 INC.,
        d/b/a SPICE, and
YONGYUT LIMLEARTVATE,

                  Defendants.

---

Case No:

**CLASS AND COLLECTIVE**
**ACTION COMPLAINT**

Plaintiffs ABEL ORTEGA ("Plaintiff ORTEGA") and MARIA GOMEZ ("Plaintiff GOMEZ") (collectively, the "Plaintiffs"), on behalf of themselves and others similarly situated, by and through their undersigned attorneys, hereby file this Class and Collective Action Complaint against Defendants, SEA THAI HOSPITALITY INC., SPICE CITY, INC., SPICEWB INC., 357 HOSPITALITY INC., 975 AMSTERDAM INC, KL 747 INC, SPICE 39 INC, SPICE ON PARK SLOPE, INC, THAMMA INC, SPICE CORNER 236 INC. (together the "Corporate Defendants"), and YONGYUT LIMLEARTVATE ("Individual Defendant" and collectively with the Corporate Defendants, the "Defendants") and states as follows:

## INTRODUCTION

1.      Plaintiffs allege, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et. seq.* ("FLSA"), that they and similarly situated individuals are entitled to recover from Defendants: (1) unpaid wages, as Defendants regularly issued their payroll through checks to Plaintiffs and FLSA Collective Plaintiffs which bounced due to insufficient funds and were then never compensated, (2) liquidated damages, and (3) attorneys' fees and costs.

2.      Plaintiffs allege that, pursuant to the New York Labor Law ("NYLL"), they and similarly situated individuals are entitled to recover from Defendants: (1) unpaid wages, as Defendants regularly issued their payroll through checks to Plaintiffs and Class Members which bounced due to insufficient funds and were then never compensated, (2) unpaid spread of hours premiums, (3) compensation for late payment of wages, (4) unreimbursed uniform expenses, (5) liquidated damages, (6) statutory penalties violations, and (7) attorneys' fees and costs.

3.      Plaintiffs allege that, pursuant to the Earned Safe and Sick Time Act ("ESSTA"), they and similarly situated individuals were not provided any paid time off for the care of themselves and/or family members. Plaintiffs and Class Members seek all applicable remedies

under the law, including compensatory damages, punitive damages, and attorneys' fees and costs.

4.    Plaintiffs bring additional claims, on behalf of themselves and a subclass of employees, pursuant to the New York State Human Rights Law, New York Executive Law § 296 ("NYSHRL"), and the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 ("NYCHRL"), due to the deprivation of their statutory rights due to Defendants' discrimination based on their (i) race, and (ii) national origin, and seek to recover (1) economic damages, (2) compensatory damages, (3) punitive damages, and (4) attorneys' fees and costs.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this controversy pursuant to 29 U.S.C. §216(b), 28 U.S.C. §§1331, 1337 and 1343, and has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

6.    Venue is proper in the Southern District pursuant to 28 U.S.C. §1391.

## PARTIES

7.    For all relevant periods, Plaintiff ABEL ORTEGA ("Plaintiff ORTEGA") was a resident of Bronx County, New York.

8.    For all relevant periods, Plaintiff MARIA GOMEZ ("Plaintiff GOMEZ") was a resident of Queens County, New York.

9.    Individual Defendant owns and operates, as a joint enterprise, eight (8) restaurants under the trade names of "Spice," "Sea Thai," and "The Sabieng Thai," which all serve South East Asian Cuisine and are all found within New York City at the following locations:

(a)    114 North 6th Street, Brooklyn, NY 11211 ("SEA Thai Brooklyn");

(b)    394 Bedford Avenue, Brooklyn, NY 11249 ("Spice Williamsburg");

(c)    435 Amsterdam Avenue, New York, NY 10024 ("Spice Upper West Side");

(d)    4745 Vernon Boulevard, Long Island City, NY 11101 ("Spice Queens");

(e)    39 East 13th Street, New York, NY 10003 ("Spice Union Square");

(f)    61A 7th Avenue, Brooklyn, NY 11217 ("Spice Park Slope");

(g)    71 1st Avenue, New York, NY 10003 ("Sabieng Thai");

(h)    975 Amsterdam Avenue, New York, NY 10025 ("Spice Upper West Side", closed in 2024), and

(i)    236 8th Avenue, New York, NY 10011 ("Spice Corner", closed in 2019)

(together, the "Restaurants").

10.    Individual Defendant operates each of the above nine (9) restaurants through the nine (9) corporate entities named in this Complaint.  Each Corporate Defendant is owned by Individual Defendant and is assigned as the nominal owner and operator for one of the above Restaurants.  While each Corporate Defendant nominally employs the individuals working at each Restaurant location, in reality, all the Restaurants are operated as a single integrated enterprise, with the Individual Defendant as a Joint Employer. Specifically, the Restaurants are engaged in related activities, share common ownership and have a common business purpose:

- The Restaurants are commonly owned through the common control of Individual Defendant who holds an executive position in all the entities and has the power to make binding decisions for the entities. Individual Defendant operates the Restaurants through the Corporate Defendants as a single integrated enterprise.

- In *Jaime Hernandez Juarez v. Spice City, Inc. et. al.* (Index No. 707519/2020), Defendants admitted in their answer that "Defendants owns, operates, or controls multiple Thai restaurants […]" SEA Thai Brooklyn, Spice Upper West Side (closed), Spice Queens, Spice Union Square, and Spice Williamsburg. *See* Index No. 707519/2020, NYSCEF Doc. No. 1, ¶ 2, complaint; *see also* Index No. 707519/2020, NYSCEF Doc. No. 2, ¶ 2, Defendants' answer.

- In the same above case, Defendants admitted that Individual Defendant is the owner, manager, and principal of Corporate Defendants SEA THAI HOSPITALITY INC, SPICE CITY INC, 975 AMSTERDAM INC, KL 747 INC, and SPICE 39 INC, and admitted that "through these corporate entities, operates or operated the restaurants as a joint or unified enterprise". *See* Index No. 707519/2020, NYSCEF Doc. No. 1, ¶ 3, complaint; *see also* Index No. 707519/2020, NYSCEF Doc. No. 2, ¶ 3, Defendants' answer.

- Employees, merchandise and supplies are interchangeable among all the Restaurants. Defendants regularly interchange employees, including Plaintiffs, between their Restaurants to perform work on an as-needed basis. Plaintiff ORTEGA worked at approximately six (6) locations (some of which are now closed and not named herein). Plaintiffs were assigned to work at multiple locations without need for new on-boarding documents, such as wage notices, I-9 forms or other information.

- In a prior case filed against Defendants, *Jaime Hernandez Juarez v. Spice City, Inc. et. al.* (Index No. 707519/2020), Defendants admitted to employing the plaintiff at five (5) Restaurants named herein, confirming Plaintiffs' personal experiences and observations of Defendants transferring employees between Restaurants. *See also* Index No. 654876/2020, NYSCEF Doc. No. 2, ¶ 4, Defendants' answer.

- Regardless of the multiple locations that Plaintiffs worked at, they were supervised by the same managers, Individual Defendant and executive chef Sapin [LNU]. These managers coordinated amongst each other to transfer employees between multiple locations based on the operational needs of each Restaurant.

- Individual Defendant describes himself as the "Owner of SEA, SPICE" on his Facebook biography. *See* **Exhibit A**.

- Individual Defendant is the liquor licensee for all the Restaurants. *See* **Exhibit B**. Pursuant to the New York State Liquor Authority Handbook for Retail Liquor Licensees, New York State liquor license holders must comply with all state and local laws and regulations governing the operations of the licensed business. *See* **Exhibit C** – New York State Liquor Authority Handbook for Retail Liquor Licensees. Because the Individual Defendant is the liquor licensee for the Restaurants, he is required by New York State law to personally ensure the Restaurants comply with the requirements in **Exhibit C**.

- In order for the Individual Defendant to comply with his legal responsibilities as the licensee, he is required to visit the premises and conduct regular internal auditing of his own business and the operations of the Restaurants. Further, Individual Defendant did comply with this legal responsibility of visiting and inspecting his Restaurants.

- At all relevant times, the Individual Defendant would have had to comply with the New York State Alcoholic Beverage Control Law and the provisions of his liquor license agreements by personally controlling the operations of the Restaurants, sufficiently supervising employees, and maintaining adequate books and records of the Restaurants.

- Plaintiffs were all subject to the same payroll and compensation policy. When Plaintiffs' checks began bouncing from one corporate entity, they began bouncing from all other corporate entities, including Corporate Defendant 975 AMSTERDAM INC and Corporate Defendant SEA THAI HOSPITALITY INC. *See* **Exhibit D**, Plaintiff ORTEGA's checks from the Upper West Side Spice location and SEA Thai Brooklyn location.

- Additionally, Plaintiffs were: (i) required to pay for their uniforms (without any reimbursement), (ii) deprived of any paid sick leave, (iii) not paid any spread of hour premiums, and (iv) were paid late by Defendants – these violations were not exclusive to a single location but shared across all Restaurants.

11.    Although Plaintiffs did not work at all of the Restaurants (they worked at 4 of the 9 Restaurants), all Defendants are still appropriately named in the Complaint through the theory of a "single integrated enterprise". Defendants' Restaurants share: (i) common ownership by Individual Defendant, as revealed by public licenses and admitted to by Defendants in a prior case, (ii) interrelation of operations as shown through the exchange of employees and supplies between the different Restaurants, (iii) centralized control of labor relations; and (iv) common management and bookkeeping by Individual Defendant as required by New York State law.

12.    Aside from Defendants' own admittance of their classification as a single integrated enterprise, Defendants' Restaurants share an adequate amount of commonalities and purposes that clearly classifies them as a single integrated enterprise. Consequently, all Restaurants and their corporate entities are properly named on the basis of their outstanding liability to similarly situated employees whom Plaintiffs seek to represent.

13.    Further, all Restaurants are properly named in the Complaint as employees similarly situated to Plaintiffs are found at all Restaurants.  The employees at the Restaurants

were all employed by Individual Defendant, who was a joint employer to Plaintiffs, potential collective plaintiffs, and putative Class Members. Further, employees from all Restaurants were subjected by their shared employer (the Individual Defendant) to the same policies and violations as the named Plaintiffs.

14.     Individual Defendant operates all Restaurants through the Corporate Defendants named in this action.  Each Corporate Defendant is assigned as nominal employer to the locations detailed below:

(a) <u>SEA Thai Brooklyn location:</u> Corporate Defendant SEA THAI HOSPITALITY INC., which is a domestic business corporation organized under the laws of the State of New York, with a principal place of business and an address for service of process both located at 114 North 6th Street, Brooklyn, NY 11211;

(b) <u>SEA Thai Brooklyn location:</u> Corporate Defendant SPICE CITY, INC. , which is a domestic business corporation organized under the laws of the State of New York, with a principal place of business and an address for service of process both located at 114 North 6th Street, Brooklyn, NY 11211;

(c) <u>Spice Williamsburg location:</u> Corporate Defendant SPICEWB INC. , which is a domestic business corporation organized under the laws of the State of New York, with a principal place of business at 394 Bedford Avenue, Brooklyn, NY 11249 and an address for service of process located at 34-11 62nd Street, 2nd Floor Woodside, NY 11377;

(d) <u>Spice Upper West Side location:</u> Corporate Defendant 357 HOSPITALITY INC. , which is a domestic business corporation organized under the laws of the State of New York, with a place of business at 435 Amsterdam Avenue, New York, NY

10024 and an address for service of process located at 71-26 Roosevelt Avenue, NY 11372;

(e) <u>Spice Upper West Side location (closed in 2024):</u> Corporate Defendant 975 AMSTERDAM INC, which is a domestic business corporation organized under the laws of the State of New York, with a principal place of business at 975 Amsterdam Avenue, New York, NY 10025 and an address for service of process located at 34-11 62nd Street, 2nd Floor Woodside, NY 11377;

(f) <u>Spice Queens location:</u> Corporate Defendant KL 747 INC, which is a domestic business corporation organized under the laws of the State of New York, with a principal place of business at 4745 Vernon Boulevard, Long Island City, NY 11101 and an address for service of process located at 34-11 62nd Street, 2nd Floor Woodside, NY 11377;

(g) <u>Spice Union Square location:</u> Corporate Defendant SPICE 39 INC, which is a domestic business corporation organized under the laws of the State of New York, with a principal place of business at 39 East 13th Street, New York, NY 10003, and an address for service of process located at 34-11 62nd Street, 2nd Floor Woodside, NY 11377;

(h) <u>Spice Park Slope location:</u> Corporate Defendant SPICE ON PARK SLOPE, INC, which is an inactive domestic business corporation which was dissolved by proclamation in 2016 but has unlawfully continued to do business in the State of New York since then, with a principal place of business and an address for service of process both located at 61A 7th Avenue, Brooklyn, NY 11217;

(i) <u>Sabieng Thai location:</u> Corporate Defendant THAMMA INC, which is a domestic business corporation organized under the laws of the State of New York, with a principal place of business at 71 1st Avenue, New York, NY 10003, and an address for service of process located at 34-11 62nd Street, 2nd Floor Woodside, NY 11377.

(j) <u>Spice Corner location:</u> Corporate Defendant SPICE CORNER 236 INC., which is a domestic business corporation organized under the laws of the State of New York, with a principle place of business at 236 8th Avenue, New York, NY 10011, and an address for service of process located at 71-26 Roosevelt Avenue 2FL, Jackson Heights, NY 11372.

15.     Individual Defendant is also listed as Chief Executive Officer of Corporate Defendants SEA THAI HOSPITALITY INC., SPICE WB INC., KL 747 INC, SPICE 39 INC, SPICE ON PARK SLOPE, INC. *See* **Exhibit E**.

16.     At all relevant times, Individual Defendant exercised control over the employment terms and conditions of Plaintiffs, FLSA Collective Plaintiffs, and Class Members.

17.     At all relevant times, Individual Defendant had and exercised the power and authority to: (i) employ and terminate employees and managers, (ii) determine their hourly rates or salaries, frequency of payments, and means of payments, (iii) establish, alter, or otherwise affect their work schedules, (iv) otherwise directly or indirectly affect the qualities of their employments, and (v) directly or indirectly maintained their employment records.

18.     At all relevant times, Individual Defendant frequently visited the Restaurants to (i) inspect the operations and quality of food, service, and hygiene of the Restaurants, (ii) meet and confer with the Restaurants' General Managers  and other managers to discuss operations,

sales, and overall status of the Restaurants and their employees, (iii) pick up or drop off supplies, ingredients, or paperwork, (iv) personally supervise employees (including Plaintiffs, FLSA Collective Plaintiffs, and Class Members) and managers and monitor their individual performances of duties and behaviors, and (v) directly or indirectly reprimand any employees (including Plaintiffs, FLSA Collective Plaintiffs, and Class Members) or managers who did not perform their duties sufficiently or correctly, or displayed inappropriate behavior.

19.    At all relevant times, Plaintiffs, FLSA Collective Plaintiffs, and Class Members could each complain to Individual Defendant (via direct contact during his visits to their relevant Restaurants) directly regarding any of the terms of their employments, and Individual Defendant would have the authority to directly affect any changes to the quality and terms of their employments.

20.    At all relevant times, Individual Defendant exercised functional control over the business and financial operations of all Corporate Defendants. Individual Defendant was not at every Restaurant continuously but instead "made the rounds" between different restaurants to deliberate with managers and supervise employees.

21.    The Restaurants visited included all locations where Plaintiffs worked. Individual Defendant would spend part of his time at the front of the restaurant, but he would usually make his way to the kitchen where Plaintiffs were working a few times during each visit to a given restaurant—which was on average one (1) or two (2) times a week (though more during some weeks when business was heavy). Individual Defendant would first confer with the supervisor of each section of the restaurant to discuss things like revenues and employee scheduling, but he would also ask workers such as Plaintiffs, FLSA Collective Plaintiffs, and Class Members about potential issues arising in the Restaurants.

22.    At all relevant times, Individual Defendant's role and decisions made in connection to his role directly affected the nature, conditions, and circumstances of Plaintiffs, FLSA Collective Plaintiffs, and Class Members.

23.    At all relevant times, each Corporate Defendant had gross annual revenues in excess of $500,000. In their answer to a prior complaint against them, Defendants admit that their Restaurants consistently generated gross annual revenues exceeding $500,000. *See also* Index No. 654876/2020, NYSCEF Doc. No. 2, ¶ 50.

24.    At all relevant times, each Corporate Defendant was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA and the NYLL.

25.    At all relevant times, the work performed by Plaintiffs and Class Members was directly essential to the business operated by Defendants.

## FLSA COLLECTIVE ACTION ALLEGATIONS

26.    Plaintiffs brings claims for relief as a collective action pursuant to FLSA Section 16(b), 29 U.S.C. § 216(b), on behalf of all non-exempt front-of-house persons (including servers, bussers, bartenders, food runners, hostesses, and delivery persons, among others) and back-of-house persons (including line cooks, preparation cooks, and dishwashers, among others) employed by Defendants on or after the date that is six years and 228 days (pursuant to NY's Executive Order tolling during the COVID pandemic) before the filing of the Complaint in this case as defined herein (herein, "FLSA Collective Plaintiffs").

27.    At all relevant times, Plaintiffs and the other FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay

Plaintiffs and FLSA Collective Plaintiffs their proper wages, as Defendants regularly issued their payroll through checks to Plaintiffs and Class Members which bounced due to insufficient funds and were then never compensated,. The claims of Plaintiffs stated herein are essentially the same as those of the other FLSA Collective Plaintiffs.

28.      The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to § 16(b) of the FLSA, 29 U.S.C. 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided to FLSA Collective Plaintiffs via first class mail to the last address known to Defendants.

## RULE 23 CLASS ALLEGATIONS

29.      Plaintiffs bring claims for relief pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all non-exempt front-of-house persons (including servers, bussers, bartenders, food runners, hostesses, and delivery persons, among others) and back-of-house persons (including line cooks, prep cooks, and dishwashers, among others) employed by Defendants on or after the date that is six years and 228 days (pursuant to NY's Executive Order tolling during the COVID pandemic) before the filing of the Complaint in this case as defined herein (the "Class" or "Class Members").

30.      The Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of Defendants. The hours assigned and worked, the position held, and rates of pay for each Class Member may also be determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23. The Class also includes a subclass of employees, all of whom

were: (i) employees of Latino and Hispanic race and/or national origin employed by Defendants, and (ii) employees who worked at the SEA Thai Brooklyn location (the "Subclass" or "Subclass Members"). Plaintiffs are all members of both the Class and the Subclass.

31.     The proposed Class is so numerous such that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown because the facts on which the calculation of that number rests presently within the sole control of Defendants, there is no doubt that there are more than forty (40) members of the Class.

32.     Plaintiffs' claims are typical of those claims that could be alleged by any member of the Class, and the relief sought is typical of the relief, that would be sought by each member of the Class in separate actions. All of the Class Members were subjected to the same corporate practices by Defendants, as alleged herein, of Defendants' failure to: (1) pay wages as Defendants regularly issued their payroll through checks to Plaintiffs and Class Members which bounced due to insufficient funds and were then never compensated, (2) compensate spread of hours premiums, (3) ensure timely payment of wages, (4) reimburse uniform expenses, (5) provide paid sick leave to employees as required under the ESSTA, (6) provide proper wage and hour notices, at dates of hiring and annually thereafter, and (7) provide proper wage and hour statements. Defendants' corporate-wide policies and practices affected all Class Members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class Member. Plaintiffs and other Class Members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices and procedures of Defendants.

33.     Additionally, Plaintiffs' claims are typical of those claims that could be alleged by any member of the Subclass. In addition to the above, Plaintiffs and all Subclass Members were

subjected to the same discriminatory treatment by Defendants, including: (i) derogatory names and insults; (ii) a prohibition on speaking their native language; (iii) restrictions on meal options during breaks; and (iv) intentional delays in meal preparation.

34.    Plaintiffs are able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class. Plaintiffs are represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

35.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because losses, injuries and damages suffered by each individual Class Member are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Member to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class Members' rights and the disposition of

their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

36.     Defendants and other employers throughout the state violate the New York Labor Law. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

37.     There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

    a)  Whether Defendants employed Plaintiffs and the Class within the meaning of the New York Labor Law;

    b)  What are and were the policies, practices, programs, procedures, protocols and plans of Defendants regarding the types of work and labor for which Defendants did not pay Plaintiffs and Class Members properly;

    c)  Whether Defendants properly notified Plaintiffs and the Class Members of their hourly rates and overtime rates;

    d)  Whether Defendants paid Plaintiffs and Class Members for all hours worked;

    e)  Whether Defendants paid Plaintiffs and Class Members their owed spread of hours premiums;

    f)  Whether Defendants reimbursed Plaintiffs and Class Members for bounced checks;

g)  Whether Defendants paid Plaintiffs and Class Members in a timely manner under New York Labor Law § 191;

h)  Whether Defendants reimbursed Plaintiffs and Class Members for their uniform expenses;

i)  Whether Defendants provided Plaintiffs and Class Members with proper wage and hour notices, at their dates of hiring and annually, per requirements of the New York Labor Law;

j)  Whether Defendants provided Plaintiffs and Class Members with proper wage statements with each payment of wages, as required by New York Labor Law;

k)  Whether Defendants provided Plaintiffs and Class Members forty (40) hours of paid sick leave a year, under the Earned Safe and Sick Time Act; and

l)  Whether Defendants subjected Plaintiffs and Subclass Members to a discriminatory and hostile work environment.

## **STATEMENT OF FACTS**

*Plaintiff ORTEGA's Employment Background*

38.    In or around November 2011, Plaintiff ORTEGA was hired by Defendants to work as a cook at Defendants' now-closed Spice location, which was located on Astor Place in Manhattan, New York. Throughout his employment, Defendants transferred Plaintiff ORTEGA to multiple restaurants, including, but not limited to, (i) Spice at 199 8th Avenue, New York, NY 10011 (now closed), (ii) Spice at 236 8th Avenue, New York, NY 10011 (now closed), (iii) SEA Thai Brooklyn at 114 North 6th Street, and (iv) Spice Upper West Side at 975 Amsterdam Avenue, New York, NY 10025 (now closed). Plaintiff ORTEGA's employment with Defendants ended in or around September 2024.

39.     Throughout his employment, Plaintiff ORTEGA was scheduled by Defendants to work five (5) days per week, from 11:00 a.m. to 12:00 a.m. for thirteen (13) hours each day, for a total of sixty-five (65) hours per week. FLSA Collective Plaintiffs and Class Members worked similar schedules and hours, frequently working a spread exceeding ten (10) hours each workday.

40.     At all relevant times, Plaintiff ORTEGA was compensated by Defendants at New York State's minimum hourly rates and paid weekly by personal check. However, for many workweeks during Plaintiff ORTEGA's employment, Plaintiff ORTEGA was either: (i) provided with checks which bounced due to insufficient funds and for which Plaintiff ORTEGA has never received compensation; or (ii) paid with proper paychecks which Defendants provided up to seven (7) days late. FLSA Collective Plaintiffs and Class Members were paid at similar hourly rates and were also subject to Defendants' illegal policy of: (i) failing to issue proper checks due to insufficient funds; or (ii) failing to timely compensate Class Members.

*Plaintiff GOMEZ's Employment Background*

41.     In or around February 2023, Plaintiff GOMEZ was hired by Defendants to work as a cook at Defendants' SEA Thai Brooklyn, located at 114 North 6th Street, Brooklyn, NY 11211, but was often transferred to Defendants' Spice Upper West Side location at 975 Amsterdam Avenue, New York, NY 10025 to work on an as-needed basis. Plaintiff GOMEZ's employment with Defendants ended in or around September 2024.

42.     Throughout his employment, Plaintiff GOMEZ was scheduled by Defendants to work four (4) days per week for over ten (10) hours a day, for a total of approximately forty-one (41) hours per week. FLSA Collective Plaintiffs and Class Members worked similar schedules and hours, frequently working a spread exceeding ten (10) hours each workday.

43.    At all relevant times, Plaintiff GOMEZ was compensated by Defendants at New York State's minimum hourly rates and paid weekly by personal check without any paystubs. However, for many workweeks during Plaintiff GOMEZ's employment, Plaintiff GOMEZ was either: (i) provided with checks which bounced due to insufficient funds and for which Plaintiff GOMEZ has never received; or (ii) paid with proper paychecks up to seven (7) days late. FLSA Collective Plaintiffs and Class Members were paid at similar hourly rates, and were also subject to Defendants' illegal policy of: (i) failing to issue proper checks due to insufficient funds; or (ii) failing to timely compensate Class Members.

*Unpaid Wages Claims for Plaintiffs, FLSA Collective Plaintiffs, and Class Members*

44.    Defendants failed to compensate Plaintiffs, FLSA Collective Plaintiffs, and Class Members their proper wages for all hours worked, as Defendants regularly issued checks to employees which bounced due to insufficient funds. Further, despite receiving complaints about this lack of payment from Plaintiffs, FLSA Collective Plaintiffs, and Class Members, Defendants refused to reissue checks and pay employees for the work they had performed.  Plaintiffs, FLSA Collective Plaintiffs, and Class Members were not paid any wages for several workweeks, in violation of the FLSA and the NYLL.

45.    Workweeks where Defendants failed to pay Plaintiffs, FLSA Collective Plaintiffs, and Class Members, due to these bounced checks include the following: (i) the workweek with checks issued on June 16, 2024, (ii) the workweek with checks issued on July 7, 2024, and (iii) the workweek with checks issued on July 25, 2025. Attached as **Exhibit D** are Examples of Bounced Checks issued to Plaintiff ORTEGA. FLSA Collective Plaintiffs and Class Members were similarly not paid for weeks of work due to Defendants repeated issuance of checks which bounced due to insufficient funds.

46.    As may be seen from the checks issued to Plaintiff ORTEGA, Defendants violation of FLSA and NYLL due to the failure to pay employees due to bounced checks occurred at all Restaurants and across the Corporate Defendants owned by the Individual Defendant.  The extent of the violation may be seen through the following:

(a) Individual Defendant through Corporate Defendant 974 AMSTERDAM INC. issued a check without sufficient funds to permit its cashing to Plaintiff ORTEGA on June 16, 2024.  Neither Individual Defendant nor Corporate Defendant 974 AMSTERDAM INC. never provided compensation to Plaintiff ORTEGA for this week of work.

(b) Individual Defendant through Corporate Defendant SEA THAI HOSPITALITY INC. issued a check without sufficient funds to permit its cashing to Plaintiff ORTEGA on July 7, 2024.  Neither Individual Defendant nor Corporate Defendant SEA THAI HOSPITALITY INC. ever provided compensation to Plaintiff ORTEGA for this week of work.

47.    Plaintiffs and other employees regularly complained about their bounced checks to their managers, but to this date, Defendants have not reissued proper checks to Plaintiffs for those workweeks. Plaintiffs' manager instead responded to their complaints by saying: "Sorry, but the boss [Individual Defendant] is building a new location and he needs the money. If you don't like it, then leave." Defendants and their management were aware of their insufficient bank accounts and failure to timely and/or properly pay employees, because Defendants were intentionally misappropriating payroll funds to expand their business.

48.    Defendants knowingly and willfully operated their business with a policy of failing to pay Plaintiffs, FLSA Collective Plaintiffs, and Class Members for all their hours worked due to Defendants' failure to reissue proper checks for Plaintiffs' workweeks, in violation of the FLSA and the NYLL.

*Late Payment of Wages Claims for Plaintiffs and Class Members*

49.    On the workweeks that Plaintiffs received a cashable check from Defendants (and not a bounced check), Defendants would withhold payment to Plaintiffs and Class Members for

approximately a week past their normal pay day.  Due to Defendants' improper withholding of compensation earned by Plaintiffs and Class Members, Defendants paid Plaintiffs and Class Members unreasonably late and in violation of the NYLL.

50.    Under NYLL § 191, Plaintiffs and Class Members are manual workers, and thus, Defendants were required to compensate Plaintiffs and Class Members within seven (7) days of the end of the week in which they earned their wages.  Plaintiffs' and Class Members' normal payday occurred seven (7) days after the end of the week in which they earned their wages. When Defendants withheld checks from Plaintiffs and Class Members past their normal payday, Defendants paid Plaintiffs and Class Members in violation of NYLL.

51.    At all relevant times, Plaintiffs spent more than 25% of their shift performing tasks that required manual labor. Plaintiffs were cooks / grillmen, and their duties involved cooking food, grilling food, cleaning counter-tops, preparing food, and hauling supplies. Clearly, Plaintiffs' positions and duties involved physical labor for the most part which qualifies them as manual laborers under the NYLL. *See Urtubia v. B.A. Victory Corp.*, 857 F. Supp. 2d 476, 482 (S.D.N.Y. 2012) ("Cooks and wait staff . . . are classified as 'manual workers' under [New York Labor Law]."). As such, Plaintiffs were required to be compensated within seven (7) days of the end of the week in which they earned their wages, pursuant to the NYLL.  Class Members worked in similar positions and had similar requirements of spending more than 25% of their shift engaging in manual labor.

*52.*    Defendants knowingly and willfully operated their business with a policy of not compensating Plaintiffs and Class Members their proper wages on a weekly basis, in violation of the NYLL. Defendants' awareness and willfulness is obvious based on the fact that Defendants were intentionally misappropriating their payroll funds.

*Unpaid Spread of Hours Premiums Claim for Plaintiffs and Class Members*

53.    At all relevant times, Defendants failed to compensate spread of hours premiums to Plaintiffs and Class Members for all days they worked with a spread of ten (10) or more hours, in violation of the NYLL.

54.    Throughout their respective employments, Plaintiffs were required by Defendants to work shifts exceeding a spread of ten (10) hours. Throughout his employment, Plaintiff ORTEGA was scheduled by Defendants to work, and did in fact work, shifts exceeding ten (10) hours five (5) days a week without additional spread of hours compensation. Similarly, Plaintiff GOMEZ was scheduled by Defendants to work, and did in fact work, shifts exceeding ten (10) hours four (4) days a week without additional spread of hours compensation. Similarly, Class Members were routinely ordered to work shifts with a spread of ten (10) or more hours without additional spread of hours compensation.

55.    Defendants knowingly and willfully operated their business with a policy of not compensating Plaintiffs and Class Members their properly owed spread of hours premiums, in violation of the NYLL. Defendants' awareness and willfulness is apparent because Defendants regularly scheduled Plaintiffs and Class Members to work shifts of ten (10) hours or longer workdays and failed to compensate them with any spread of hours premiums for those days.

*Unreimbursed Uniform Expenses Claim for Plaintiffs and Class Members*

56.    At all relevant times, Defendants failed to reimburse Plaintiffs' and Class Members' uniform expenses, in violation of the NYLL.

57. Defendants required Plaintiffs to buy uniforms, consisting of four (4) red T-Shirts, which cost a total of ninety-six dollars ($96.00). Defendants never reimbursed Plaintiffs for their uniforms, and as a result, Defendants reduced Plaintiffs' pay below the New York State minimum wage. Similarly, Defendants required Class Members to pay Defendants for their uniforms.

58. Defendants knowingly and willfully operated their business with a policy of not reimbursing Plaintiffs' and Class Members' uniform expenses, in violation of the NYLL.

*Plaintiffs' WTPA Violation Claims for Plaintiffs and Class Members*

59. At all relevant times, Plaintiffs and Class Members never received a wage notice from Defendants. Further, during the statutory period, Plaintiffs and Class Members did not receive wage statements from Defendants.

60. In violation of the Wage Theft Protection Act ("WTPA")—incorporated into NYLL—Defendants knowingly and willfully operated their business with a policy of not providing wage notices to Plaintiffs and Class Members at the beginning of their employment with Defendants.

61. In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that entails a concrete harm to an interest identified by the New York State legislature. As one Court observed:

> Here, Plaintiffs allege that Defendants failed to furnish them with proper wage notices and statements, as required by NYLL §§ 195(1) and 195(3). These provisions were enacted as part of New York's Wage Theft Prevention Act ("WTPA"), N.Y. Lab. Law § 195, which sought "to expand the rights of employees to seek civil and criminal avenues of remedy for their employers failing to follow labor law appropriately and the specifications therein." N.Y. Spons. Mem., 2010 S.B. 8380. More specifically, the New York State Assembly passed the WTPA to address studies showing that a large number of employees were not being paid the wages owed to them, and that many employers were not adequately informing their employees of their wages and how they are calculated

22

in language the employees could understand. *Id.* The New York State Assembly opined that existing penalties did not adequately deter employers from paying less than the wages owed, and stated that the WTPA would dramatically change this by increasing penalties for violating employees' rights. *Id.*

*Imbarrato v. Banta Mgmt. Servs*., 2020 U.S. Dist. LEXIS 49740, *21-22 (S.D.N.Y. March 20, 2020)

62.    Here, Defendants' failure goes beyond generating a risk of harm to Plaintiffs and Class Members. Defendants' conduct actually harmed Plaintiffs and Class Members. Defendants' failure to provide wage notices and paystubs listing all hours actually worked and rates of pay, including overtime hours and overtime rates, deprived employees of the ability to contest the pay provided by Defendants, allowed Defendants to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiffs' and Class Members' rights. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Defendants' failure to provide wage notices and wage statements to employees allowed Defendants to hide their responsibility and deprive employees of timely compensation.

63.    Had Defendants provided to Plaintiffs and Class Members proper wage statements, as required by law, Defendants would have had to either (a) increase the wages to correspond to the spread of hour premiums earned and reflect their unpaid wages or (b) forthrightly acknowledge, by way of the wage statement, that the employee's wages did *not* correspond to the premiums that the employee actually earned. Either possibility would have allowed Plaintiffs and Class Members to vindicate their rights under the NYLL. The deprivation of these possibilities therefore constitutes an injury.

64.    The failure to provide proper wage notices and wage statements continues to result in delayed payment of all proper wages owed to Plaintiffs and Class Members. This delayed payment caused Plaintiffs and Class Members to struggle to pay bills and other debts.

65.    Defendants knowingly and willfully operated their business with a policy of not providing proper wage notices and wage statements as required by NYLL.

66.    The direct effect of understating the number of hours an employee worked is to reduce the wages that employees are listed as having earned on their wage statements. The direct effect of this, in turn, is to reduce the employee earnings that the employer later reports to the IRS through the employee's W-2 form, as such information is derived from the information on employees' wage statements. *See Mills v. Mills*, 2021 Minn. Dist. LEXIS 200, *5 (Minn. Dist. Ct., Anoka County, Tenth Judicial District May 20, 2021) ("Petitioner's gross annual income, based on her 2020 W-21 and paystub dated 12/24/20, is $130,321.30"); *T.F. v. N.F.*, 820 N.Y.S.2d 846, 846 (Sup. Ct., Suffolk Cty., June 22, 2006) ("In 2005 the Plaintiffs earned $ 133,086 as reflected on his final year paystub and W-2").[1]

67.    The effect of reporting reduced wages on an employees' W-2 is, in turn, to reduce the amount of social security benefits available to the employee, as an employee's entitlement to benefits reflects how much money he or she is reported as having contributed to the social security system. *See McGauran v. Soc. Sec. Comm'n*, 2001 U.S. Dist. LEXIS 3187, *7 (N.D.

---

[1] It is true that the wages reported on W-2 forms are not always precisely identical to those listed on an employees' last paystub for the year. One reason for this is, as the IRS explains, that "W-2 wages include: (i) the total amount of wages as defined in section 3401(a); (ii) the total amount of elective deferrals (within the meaning of section 402(g)(3)); (iii) the compensation deferred under section 457; and (iv) the amount of designated Roth contributions (as defined in section 402A)." https://www.irs.gov/pub/irs-drop/rp-19-11.pdf. However, the possibility that wages listed on a W-2 might be affected by such considerations does not change the fact that the base wages on the W-2 are derived from paystubs. The paystub processing service *realcheckstubs* explains: "A pay stub contains crucial information that assists in calculating W2 wages. Paystub provides gross wages, deductions, taxes withheld, and other income-related data. Individuals gather the necessary figures required for accurate W2 calculation by referring to the pay stub." https://www.realcheckstubs.com/blog/paystubs/6-steps-how-to-calculate-w-2-wages-from-paystub.

Cal. March 19, 2001) ("Social security benefits are based upon the worker's earnings as reported to the [SSA] . . . [and] the worker's earnings are used to determine insured status for entitlement to retirement and to calculate cash benefit rates." (quoting Social Security Administration, Handbook § 1400 (1997)); *Coward v. Zurich Am. Ins. Co*., 2011 U.S. Dist. LEXIS 74543, *3 (N.D. Ill. July 8, 2011) ("Under the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year.'") (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

68.      "In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation." *Chen v. Lilis 200 W. 57th Corp.*, 2023 U.S. Dist. LEXIS 38163, *18 (S.D.N.Y. Mar. 7, 2023). "On the other hand, 'allegations' that go 'beyond asserting a bare statutory violation and sufficiently allege concrete harm' resulting from 'the underpayment of wages' pass muster because 'monetary injury is a concrete harm sufficient for purposes of Article III standing.'" *Thompson v. Elev8 Ctr. N.Y.*, LLC, 2023 U.S. Dist. LEXIS 122504, *21 (S.D.N.Y. July 17, 2023) (quoting *Mateer v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 125017, *4 (S.D.N.Y. July 14, 2022)).

69.      Here, it is clear that Defendants' failure to provide Plaintiffs and Class Members with accurate wage statements entailed "concrete, downstream consequences" involving monetary injury. Had the spread of hours premiums been accurately reported for a given pay period, Defendants' automatic payroll system would have correspondingly increased the wages due for that period, which in turn would have been reflected in the W-2s that Defendants submitted to the IRS on behalf of Plaintiffs and Class Members. That, in turn, would have increased Plaintiffs' and Class Members' entitlement to social security benefits. Because the

inaccuracy prevented this outcome, it constitutes an injury sufficient to provide Plaintiffs with Article III standing.

70.     Courts agree that the misreporting of wages constitutes a concrete injury cognizable under Article III:

> The Seventh Circuit in *Calderon* squarely addressed FICA standing. The plaintiffs in *Calderon* were former employees alleging the employer failed to pay their FICA taxes. 999 F.2d at 1105-06. The Seventh Circuit found that the plaintiffs lacked standing to compel the employer to pay their FICA taxes because "[b]enefits do not. . . depend on whether the employer actually paid the taxes." *Id.* at 1106. Plaintiffs could, however, enforce FICA's reporting requirement because it is the reporting of income that triggers benefits, and losing benefits is an injury under *Lujan. Id.* Whether the employer in *Calderon* made FICA payments on the plaintiffs' behalf had no bearing on the plaintiffs' entitlement to benefits. *Id.* "[T]he Plaintiffs' real interest lies in ensuring that the [employer] make the proper reports of their income." *Id.*

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3-4.

71.     The case at bar is somewhat different from *Coward* inasmuch as Defendants actually underpaid Plaintiffs and other employees rather than merely misreporting their income. But this distinction has no bearing on the question of Article III standing, since it is still the case that "it is the reporting of income that triggers benefits, and losing benefits is an injury." *Id.* Plaintiffs and Class Members lost benefits by virtue of how Defendants reported their income, and how Defendants reported employees' income was the direct outcome of the inaccuracies in employees' wage statements. That is why "Plaintiffs have standing to enforce the statutory reporting requirements" imposed by the WTPA. *Calderon v. Witvoet*, 999 F.2d 1101, 1106 (7th Cir. 1993).

72.     Whether or not any Class Members are presently eligible for social security benefits is legally immaterial. *See id.* ("Although only citizens and aliens residing in the

United States may receive benefits, 42 U.S.C. § 402(t), plaintiffs may eventually fulfill this requirement and therefore are entitled to keep their Social Security accounts accurate.").

73.    The *Calderon* court stressed that an employee's interest in ensuring that an employer properly report the employee's income is amplified by the difficulty of persuading the government to correct errors:

> The practical difficulty is that eligibility for Social Security benefits presumptively depends on reports that employers send to the government. A worker who seeks credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4), which will be hard to carry if the employer has not furnished the customary documentation. The government believes employers who report earnings, because these reports are costly to make--they entail paying a substantial tax. The government tends not to believe undocumented claims by employees, because these claims are essentially costless yet could establish entitlement to large pensions or disability benefits.
>
> All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets make the proper reports of their income. *Id.*

74.    Here, the problem is not merely challenging but insurmountable. Plaintiffs and Class Members cannot even attempt to have their earnings report corrected because Defendants *did* report what they actually paid Plaintiffs and Class Members. The problem, rather, is that Plaintiffs and Class Members were underpaid. Yet the ultimate effect is the same—reduced social security eligibility. Because "[u]nder the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year,'" Plaintiffs were irreversibly injured with respect to their social security benefits as soon as Defendants sent their W-2s to the IRS. *Coward*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

75.    Defendants knowingly and willfully operated their business with a policy of failing to provide Plaintiffs and Class Members with wage notices and accurate wage statements, in violation of the NYLL.

*ESSTA Claims for Plaintiffs and Class Members*

76.     Defendants employed more than (4) people in their Restaurants, and thus, Defendants were mandated to provide up to forty (40) hours of paid leave each calendar year pursuant to the ESSTA.

77.     At all times, Defendants failed to provide Plaintiffs and Class Members with forty (40) hours of paid sick leave each calendar year. As a result, Plaintiffs and Class Members were either (i) required to work whilst sick, or (ii) forced to take sick leave without pay.

78.     Defendants failed to provide Plaintiffs and Class Members with paystubs during the statutory period, thereby depriving them of any information regarding their accrued and total leave balances.

*Plaintiffs' and Subclass Members' Discrimination and Hostile Work Environment Claims*

79.     Plaintiffs and Subclass Members are of Hispanic / Latino descent, and their primary language is Spanish. As detailed above, Defendants' Restaurants are all commonly owned and operated by Individual Defendant, who is of Thai descent. The Restaurants employ managers that are also of Thai or Asian descent.

80.     Throughout their employment, Plaintiffs and Subclass Members endured a hostile work environment created and perpetuated by Defendants, based on Plaintiffs' and Subclass Members' race and national origin, in violation of the NYSHRL and NYCHRL

81.      Plaintiffs and Subclass Members were employees who (i) worked at 114 North 6th Street, and (ii) were of Hispanic / Latino descent, and/or spoke the Spanish language as a primary language. As stated in the above sections, Plaintiffs worked at Defendants' Spice location on 114 North 6th Street throughout the statutory period.  One of the managers at this location was Sapin [LNU], a chef who worked closely with Plaintiffs.

82.    <u>First,</u> manager Sapin [LNU] regularly mocked Plaintiffs, along with other Subclass Members, referring to them in derogatory Spanish terms such as "pendeja" (Spanish for "dumbass"). Sapin [LNU] specifically used these Spanish terms to cause greater offense to Plaintiffs and Subclass Members. Had Plaintiffs and Subclass Members not been of Hispanic descent and/or Spanish speakers, Sapin [LNU] would not have used derogatory Spanish terms against them. Additionally, Plaintiffs' other Thai managers regularly referred to Plaintiffs and Subclass Members as "stupid" or "dumb" in English. On the other hand, Plaintiffs never witnessed Thai or other Asian employees be treated in a humiliating and degrading manner.

83.    <u>Second,</u> Defendants exhibited extreme favoritism towards non-Hispanic staff while discriminating against Hispanic staff by prohibiting them from speaking in their own language. Defendants prohibited Hispanic staff from conversing in Spanish, while allowing non-Hispanic staff to freely converse in their native Asian languages such as Thai, Chinese, Burmese, Malay, and Lao, among others. As a direct result of Defendants' discriminatory language policy, Plaintiffs and Subclass Members were unlawfully prohibited from speaking in their native languages, and were denied the opportunity to conversate in the language most comfortable to them, in contrast to their Asian co-workers.

84.    <u>Third,</u> Defendants discriminatorily limited the range of meals that were provided to Plaintiffs and other Subclass Members for their meal break. Plaintiffs and Subclass Members were only permitted to order menu items within a certain price range. Defendants strictly prohibited Plaintiffs and Subclass Members from eating menu items with prices past Defendants' arbitrary threshold. However, Defendants allowed all Thai and Asian employees to order and eat any meals on the menu, regardless of their prices. On the occasion that employees were served a

family meal, Plaintiffs and Subclass Members would be provided with chicken only, while other Asian employees were free to order anything they so wished.

85.    <u>Fourth,</u> when Plaintiffs and Subclass Members ordered their meals in the Restaurant, Thai cooks would intentionally prolong the time it took to cook their meals. Their meals would take more than twenty (20) minutes to prepare, and as a result, Plaintiffs and Subclass Members were forced to eat their food in a short amount of time before resuming their shift. Due to the short time that they were given to eat their lunches, Plaintiffs and Subclass Members would be forced to discard their unfinished food and they often worked hungry. However, when Thai or Asian employees ordered their meals during meal break, their meals would be made as soon as possible without any delays. The Thai cooks subjected Plaintiffs and Subclass Members to disparate treatment, emulating the behavior of Defendants' upper management, confident that they would not suffer repercussions for their discriminatory actions.

86.    Defendants' discriminatory conduct herein was clearly a result of Plaintiffs' and Subclass Members' race and national origin. Any other reasons provided by Defendants are clearly pretextual.

87.    At all relevant times, Defendants knowingly and willfully operated their business with a policy of subjecting Plaintiffs and Subclass Members to discrimination.

88.    As a result of Defendants' discriminatory conduct, Plaintiffs and Subclass Members suffered from emotional distress and humiliation.

89.    Plaintiffs retained Lee Litigation Group, PLLC to represent Plaintiffs, FLSA Collective Plaintiffs, and Class Members in this litigation, and has agreed to pay the firm a reasonable fee for its services.

## STATEMENT OF CLAIM

## COUNT I

## VIOLATION OF THE FAIR LABOR STANDARDS ACT

90.    Plaintiffs reallege and incorporate all the above allegations of this Complaint as fully set forth herein.

91.    At all relevant times, Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiffs and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207 (a).

92.    At all relevant times, Defendants employed Plaintiffs and FLSA Collective Plaintiffs within the meaning of the FLSA.

93.    At all relevant times, Defendants had a policy and practice that failed to pay Plaintiffs and FLSA Collective Plaintiffs their properly owed wages, including overtime, for all hours worked, due to improper issuance of checks which bounced due to insufficient funds.

94.    Records, if any, concerning the number of hours worked by Plaintiffs and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiffs and FLSA Collective Plaintiffs should be in the possession and custody of the Defendants. Plaintiffs intend to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

95.    Defendants knowingly and willfully disregarded the provisions of the FLSA by failing to compensate Plaintiffs and FLSA Collective Plaintiffs their proper wages. This is evidenced by Defendants' issuance of checks which bounced due to insufficient funds, despite their full knowledge that the bank accounts lacked the necessary balance. Plaintiffs repeatedly

complained to Defendants about the issue, yet Defendants failed to reissue valid checks to properly compensate them for those workweeks.

96.    As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiffs and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

97.    Due to the intentional, willful, and unlawful acts of Defendants, Plaintiffs suffered damages in an amount not presently ascertainable of unpaid wages and liquidated damages.

98.    Plaintiffs and FLSA Collective Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. §216(b).

## COUNT II

## VIOLATION OF THE NEW YORK LABOR LAW

99.    Plaintiffs reallege and incorporate all the above allegations of this Complaint as fully set forth herein.

100.    At all relevant times, Plaintiffs and Class Members were employed by the Defendants within the meaning of the New York Labor Law, §§2 and 651.

101.    Defendants willfully violated Plaintiffs' and Class Members' rights by subjecting them to a policy of failing to pay wages, as Defendants issued checks to Plaintiffs and Class Members which bounced due to insufficient funding.

102.    Defendants willfully violated Plaintiffs' and Class Members' rights by failing to pay them timely weekly wages, as required by the NYLL § 191(a)(1).

103.    Defendants willfully violated Plaintiffs' and Class Members' rights by failing to pay them any spread of hour premiums for all their shifts with a spread exceeding ten (10) hours.

104.    Defendants willfully violated Plaintiffs' and Class Members' rights by failing to reimburse their uniform expenses. As a result, Plaintiffs' and Class Members were deducted below the New York Minimum Wage due to these uniform costs.

105.    Defendants failed to properly notify employees of their hourly pay rate and overtime rate, in direct violation of the New York Labor Law.

106.    Defendants failed to provide Plaintiffs and Class Members with proper wage and hour notices, at their dates of hiring and annually, per requirements of the New York Labor Law.

107.    Defendants failed to provide Plaintiffs and Class Members with proper wage statements with every payment as required by New York Labor Law § 195(3).

108.    Due to the Defendants' New York Labor Law violations, Plaintiffs and Class Members are entitled to recover from Defendants their unpaid minimum wages, unpaid overtime wages, unpaid spread of hours premiums, uniform expenses, reasonable attorneys' fees, liquidated damages, statutory penalties, and costs and disbursements of this action, pursuant to New York Labor Law.

## **COUNT III**

## **VIOLATIONS UNDER THE**
## **EARNED SICK AND SAFE TIME ACT**

109.    Plaintiffs reallege and incorporate all the foregoing paragraphs of this Complaint as if fully set forth herein.

110.    Defendants knowingly and willfully failed to provide Plaintiffs and Class Members with proper sick leave as required under the ESSTA.

111.    Defendants are employers covered by ESSTA's sick leave provision as an "employers with between five and ninety-nine employees in any calendar year, each employee

shall be provided with up to forty hours of paid sick leave in each calendar year." NY Lab. Law § 196-B(1)(b).

112.    Defendants are required to give employees sick leave upon oral or written request for "a mental or physical illness, injury, health condition of such employee. . . regardless of whether such illness, injury, or health condition has been diagnosed or requires medical care at the time that such employee requests such leave." NY. Lab. Law § 196-B(4)(a).

113.    NYLL makes it unlawful for an "employer or his or her agent, or the officer or agent of any corporation, partnership, or limited liability company, or any other person, shall discharge, threaten, penalize, or in any other manner, discriminate, or retaliate against any employee because such employee has exercised his or her rights afforded under this section, including, but not limited to, requesting sick leave and using sick leave, consistent with the provisions of section two hundred fifteen of this chapter." New York Lab. Law § 196-B(7).

Due to Defendant's ESSTA violations, Plaintiffs seek all applicable remedies under the law, including compensatory damages, punitive damages, and attorneys' fees and costs.

**COUNT IV**

**VIOLATIONS UNDER THE
NEW YORK STATE HUMAN RIGHTS LAW**
**(N.Y. Exec. Law § 292, *et seq*.)**
**(Plaintiffs' and Subclass Members' only)**

114.    Plaintiffs reallege and incorporate all the above allegations as if fully set forth herein.

115.    The New York State Executive Law § 296(1)(a) provides that:

"1. It shall be an unlawful discriminatory practice:

> (a) For an employer or licensing agency, because of an individual's [...] race, [...] color, national origin [...] to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

116.    Defendants violated the New York State Human Rights Law when they discriminated against Plaintiffs and Subclass Members on the basis of their race and national origin.

117.    Not only did Defendants do nothing to abate or prevent the discrimination suffered by Plaintiffs and Subclass Members, their upper management condoned and participated in such practices, including but not limited to: (i) labelling Plaintiffs and Subclass Members in derogatory terms; (ii) prohibiting them from conversing in their native language; (iii) restricting their meal options; and (iv) intentionally prolonging the preparation of their meals. Other Asian and/or non-Hispanic employees were not subject to these policies.

118.    This discriminatory conduct was in willful disregard of the provisions of the NYSHRL.

119.    As a direct and proximate result of Defendants' willful disregard of the NYSHRL, Plaintiffs and Subclass Members suffered damages. Plaintiffs seeks all applicable remedies under the law on behalf of themselves and Subclass Members, including compensatory damages, punitive damages, and attorneys' fees and costs.

## **COUNT V**

**<u>VIOLATIONS UNDER THE</u>**
**<u>NEW YORK CITY HUMAN RIGHTS LAW</u>**
**(N.Y.C. Admin. Code § 8-101, *et seq.*)**
**(Plaintiffs' and Subclass Members only)**

120.    Plaintiffs reallege and incorporate all the above allegations as if fully set forth herein.

121.    The New York City Administrative Code §8-107(1)(a) provides that:

"1. It shall be an unlawful discriminatory practice:

    (a) For an employer or an employee or agent thereof, because of the actual or perceived [...] race, [...] color, national origin [...] of any person:

        (1)  To represent that any employment or position is not available when in fact it is available;

        (2)  To refuse to hire or employ or to bar or to discharge from employment such person; or

        (3)  To discriminate against such person in compensation or in terms, conditions or privileges of employment."

122.    Defendants violated the New York City Human Rights Law when they when they discriminated against Plaintiffs and Subclass Members on the basis of their race and national origin.

123.    Not only did Defendants do nothing to abate or prevent the discrimination suffered by Plaintiffs and Subclass Members, their upper management condoned and participated in such practices, including but not limited to: (i) labelling Plaintiffs and Subclass Members in derogatory terms; (ii) prohibiting them from conversing in their native language; (iii) restricting their meal options; and (iv) intentionally prolonging the preparation of their meals. Other Asian and/or non-Hispanic employees were not subject to these policies.

124.    This discriminatory conduct was in willful disregard of the provisions of the NYCHRL.

125.    As a direct and proximate result of Defendants' willful disregard of the NYCHRL, Plaintiffs and Subclass Members suffered damages. Plaintiffs seeks all applicable remedies under the law on behalf of themselves and Subclass Members, including compensatory damages, punitive damages, and attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves, FLSA Collective Plaintiffs, and Class Members, respectfully request that this Court grant the following relief:

a.    A declaratory judgment that the practices complained of herein are unlawful under the FLSA, the NYLL, the NYSHRL, the NYCHRL, and the ESSTA;

b.    An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c.    An award of unpaid wages, including overtime, due under the FLSA and the NYLL;

d.    An award of unreimbursed uniform expenses, due under the NYLL;

e.    An award of unpaid spread of hours premiums, due under the NYLL;

f.    An award of liquidated damages and interest for each late payment of wages pursuant to NYLL § 191(1)(a)(i);

g.    An award of statutory penalties as a result of Defendants' failure to comply with New York Labor Law wage notice and wage statement requirements;

h.    An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay wages pursuant to 29 U.S.C. § 216;

i.   An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay wages pursuant to the NYLL;

j.   All applicable compensatory and punitive damages under the ESSTA;

k.   An award of compensatory damages and punitive damages due under the NYSHRL and the NYCHRL;

l.   An award of pre-judgment and post-judgment interests, costs, and expenses of this action together with reasonable attorneys' and experts' fees and statutory penalties;

m.   Designation of this action as a collective action pursuant to 29 U.S.C. § 216(b);

n.   Designation of Plaintiffs as Representatives of the FLSA Collective Plaintiffs;

o.   Designation of this action as a class action pursuant to F.R.C.P. 23;

p.   Designation of Plaintiffs as Representatives of the Class;

q.   Designation of Plaintiffs as Representatives of the Subclass; and

r.   Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury on all issues so triable as of right by jury.

## NY BCL §630 NOTICE AND DEMAND

Plaintiffs hereby give this notice, in writing, to each shareholder of Corporate Defendants, and any of its parents, subsidiaries, or affiliated entities that is served with the summons and complaint in this action, that they intend to hold the shareholders liable under New York Business Corporation Law § 630. This notice is given within one hundred and eighty days after termination of the employment services of Plaintiffs.

Plaintiffs also demand an examination of the record of shareholders under paragraph (b) of section 624 (Books and records; right of inspection, prima facie evidence) of New York Business and Corporation Law.

An action to enforce such liability shall be commenced within ninety days after the return of an execution unsatisfied against the corporation upon a judgment recovered against it for such services. The provisions of this paragraph shall not apply to an investment company registered as such under an act of congress entitled "Investment Company Act of 1940."

Dated: May 9, 2025                              Respectfully submitted,
      New York, New York

                                           **LEE LITIGATION GROUP, PLLC**
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181

*Attorneys for Plaintiffs,*
*FLSA Collective Plaintiffs,*
*and the Class*

By:    /s/ *C.K. Lee*
       C.K. Lee, Esq. (CL 4086)